UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

CRAIG EASTOP,

    Plaintiff,

    v.

SHAWN BENNION, ROB
CLAYTON, KELLY GREEN,
ELLEN MANDEVILLE, KEVIN
GARRISON, all in their official
Capacities as members of the BOARD
OF TRUSTEES OF THE BLAINE
COUNTY SCHOOL DISTRICT, and
GWENCAROL HOLMES, in her
official capacity as Superintendent,

    Defendants.

Case No. 1:18-cv-00342-BLW

MEMORANDUM DECISION &
ORDER

## INTRODUCTION

Before the Court are Plaintiff's Partial Motion for Summary Judgment (Dkt.

15), Defendants' Motion for Summary Judgment (Dkt. 17), Plaintiff's Motion to

Strike Declaration of Jetta Hatch Mathews (Dkt. 22), and Defendants' Motion to

Substitute Declarations and Briefing *nunc pro tunc* (Dkt. 24). The Court heard oral

arguments on August 22, 2019 and took the motions under advisement. For the

reasons explained, the Court will deny Plaintiff's motion for partial summary

judgment, deny in part and grant in part Defedants' motion for summary judgment, deny Plaintiff's motion to strike, and deny Defendants' motion to substitute.

## BACKGROUND

Plaintiff Craig Eastop filed a complaint for wrongful termination alleging violations of Idaho law, breach of contract, violation of the Rehabilitation Act, and constitutional violations. Due to the complexity of the claims and corresponding facts, specific facts will be discussed in the context of each claim, what follows is a general factual background.

Craig Eastop was an elementary school teacher in the Blaine County School District from 2000 until he was terminated on November 17, 2017. *Complaint* ¶¶ 6, 7. Eastop taught elementary Physical Education from 2006 until 2017. *Eastop Depo., Def.'s Ex. 20* at 27-28, Dkt. 17-3. During his employment Eastop received positive teaching evaluations and was regarded as a good teacher. *Evaluation, Pl.'s Ex. C,* Dkt. 15-6 at 7-14; *Henson Depo., Def.'s Ex. 21* at 51, Dkt 17-3.

Beginning in the fall of 2016 and continuing through spring of 2017 school district officials received reports of Eastop's inappropriate behavior and struggle with alcohol. In September, Principal Brad Henson received an email from a teacher regarding sexual comments Eastop made to her. *Def.'s Ex. 3,* Dkt. 29-4. Principal Henson sent Eastop an email addressing these comments and raising

concerns about his alcohol use. *Def.'s Ex. 4*, Dkt. 29-4. In October, Eastop was arrested for driving under the influence, the charges were dismissed because he was below the legal limit. *Eastop Depo.* at 21-22, Dkt. 17-3. Superintendent John Blackman[1] and Human Resources Director Shannon Maza met with Eastop regarding the arrest and to discuss a plan for his sobriety. *Id.* at 43-44.

In April, 2017, Principal Henson was contacted by PTA members regarding Eastop's behavior at a PTA fundraiser off school grounds, the PTA members reported that Eastop was noticeably altered and his thoughts were unconnected to the point that their children asked what was wrong. *Pl.'s Ex. J*, Dkt. 15-15. Principal Henson emailed Eastop and Maza about the report. *Id.* In late April, 2017, Eastop led a school assembly in Principal Henson's absence. Eastop had previously been hit in the face with a rock on the playground and described using the assembly as a teachable moment. *Eastop Depo.* at 61-64, Dkt. 17-3. Principal Henson received multiple reports about Eastop's behavior at the assembly. *Henson Depo.* at 20-23, Dkt. 17-3. Eastop's behavior was described as erratic and inappropriate. *Cassalia Letter*, *Def.'s Ex. 9*, Dkt. 29-4. On May 11, 2017 Principal Henson found Eastop with chewing tobacco in his lip in violation of the District's anti-tobacco

---

[1] John Blackman was the Superintendent prior to GwenCarol Holmes, it is unclear from the record exactly when Holmes replaced Blackman.

policy. *Compl.* ¶ 13. On May 12, 2017 Principal Henson was called outside based on a report Eastop had been hit with another rock and was screaming at the students. *Henson Depo.* at 25, Dkt. 17-3. Henson found Eastop again had tobacco residue in his lip. *Id.* at 25-26. Following this incident, Henson and Maza met with Eastop and Joy Spencer, the teacher's union representative. *Id.* at 26. Henson and Maza discussed the concerns raised about Eastop's behavior at the assembly and Eastop's tobacco use. *Id.* When asked if he knew about the Tobacco Policy, Eastop said he knew about it and chose to violate it. *Id.*; *Eastop Depo.* at 31, Dkt. 17-3. Following the meeting Eastop was placed on administrative leave pending investigation of his behavior. *Henson Depo.* at 27; *Def.'s Ex. 27*, Dkt. 29-3. Henson subsequently searched Eastop's office and found a can of chewing tobacco. *May 12, 2016 Meeting Notes, Pl.'s Ex. F*, Dkt. 15-10 at 14. On May 23, 2017 a parent of a student communicated to Maza that Eastop had previously stopped by their house and seemed intoxicated. *Def.'s Ex. 12*, Dkt. 29-5. Eastop said he had a couple of beers but was not intoxicated. *Eastop Depo.* at 46, 120-21, Dkt. 17-3. During the investigation, Maza received reports from teachers that Eastop appeared to be under the influence at school. *Maza Depo.* at 41-43, Dkt. 17-4.

On May 25, 2017 Superintendent GwenCarol Holmes recommended to the Board of Trustees that Eastop be placed on probation. *Holmes Depo.* at 7, Dkt. 17-3; *Maza Depo.* at 32, Dkt. 17-4. Maza had previously recommended termination to

Holmes. *Maza Depo.* at 13-14, 32, Dkt. 17-4. Henson also felt that termination was appropriate. *Henson Depo.* at 32, Dkt. 17-3. The Board ultimately voted to begin termination proceedings. *Bennion Depo.* at 17-18, Dkt. 17-4. At some point between the May decision to begin termination proceedings and August 15, 2017 the Board changed its decision and instead placed Eastop on Probation. *See Notice of Probation, Pl.'s Ex. F*, Dkt. 15-10 at 15. The August 15 notice of probation included a Program for Supervision and Evaluation ("Probation Terms") setting out Eastop's terms of probation. *Id.* at 16. The Probation Terms contained a requirement that Eastop submit to drug and alcohol testing at the discretion of "Mr. Henson or designee or any administrator from the District office." *Probation Notice*, *Def.'s Ex. 17*, Dkt. 17-3 at 16. On August 22, 2017 Maza, Henson, Eastop, and Eastop's Union Representatives Linda Jones and Tryntje VanSlyke met to discuss the terms of probation and Eastop's employment. *Maza Depo.* at 53, Dkt. 17-4; *Eastop Depo.* at 83-85, Dkt. 17-3. At the meeting, Eastop signed his employment contract but refused to sign the Probation Terms, because he objected to the testing provision. *Eastop Depo.* at 84, 86-87, Dkt. 17-3; *Maza Depo.* at 53-54, Dkt. 17-4. Also, at the meeting, Jones raised concerns that the Board of Trustees may be biased against Eastop. *Transcript, Pl.'s Ex. N*, Dkt. 15-20 at 3.

The Probation Terms were modified on August 23, 2017 to remove "or any administrator from the District office," but were otherwise unchanged. *Compare*

*Def.'s Ex. 17,* Dkt. 17-3 at 16 *with Pl.'s Ex. F,* Dkt. 15-10 at 20. Henson and Maza

both signed the Probation terms, but Eastop did not. *Pl.'s Ex. F,* Dkt. 15-10 at 20.

On the August 23, at the direction of Superintendent Holmes, Maza asked Eastop to

submit to drug and alcohol testing. *Maza Depo.* at 63, Dkt. 17-4. Maza did not

suspect Eastop was under the influence of drugs or alcohol at that time, instead she

described the test as a "baseline." *Id.* at 64. Eastop refused to submit to testing. *Id.*

at 65; *Eastop Depo.* at 93-94, Dkt. 17-3. Eastop was subsequently placed on

administrative leave for violating the terms of his probation, specifically refusing to

submit to drug and alcohol testing. *Notice of Admin. Leave, Pl.'s Ex. G*, Dkt. 15-12

at 41.

On September 12, 2017 Board of Trustees Chairman, Shawn Bennion,

notified Eastop that the Board had voted to begin termination proceedings and had

scheduled a due process hearing. *Notice of Due Process Hearing, Pl.'s Ex. H*, Dkt.

15-13 at 10. The Due Process Hearing was held on October 25, 2017. *Transcript,*

*Def.'s Ex. 1*, Dkt. 17-2. Marvin Smith presided as the hearing officer, the School

District was represented by Scott Marotz of Anderson, Julian & Hull LLP, and

Eastop was represented by Paul Stark of the Idaho Education Association. *Id.* at 1-

2. At the beginning of the hearing Stark and Marotz conducted *voir dire* of the

Board. *Id.* at 10. The Board members testified that there was no reason they could

not have an open mind, hear evidence, and make a decision based on that evidence.

*Id.* at 27-28. Following the hearing, the Board decided to terminate Eastop for his refusal to submit to testing as prescribed by the Probation Terms. *Findings of Fact, Conclusions, and Decision*, *Pl.'s Ex. H*, Dkt. 15-13 at 19.

Eastop filed this action against the Board of Trustees, and each individual board member in their official capacities, and against GwenCarol Holmes in her official capacity. *Compl.* at 1. Eastop alleges violation of Idaho law, breach of contract, infliction of emotional distress, violations of the Rehabilitation Act, and violations of the Constitution, including an unreasonable search under the Fourth Amendment and violation of his procedural due process rights under the Fourteenth Amendment. *Id.* at 12-25. He seeks reinstatement as a teacher and damages. *Id.* at 26.

## LEGAL STANDARD

### 1. Motion to Strike

Federal Rule 56(c) governs the procedures that the parties must comply with to support or dispute a motion for summary judgment. See Fed. R. Civ. P. 56(c). Under Rule 56(c)(2), a party "may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." *Id*. An affidavit is an acceptable form in which to present evidence in the summary judgment context. However, "[a]n affidavit or declaration used to support or

oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

Rule 56 makes clear then that only admissible evidence may be considered in ruling on a motion for summary judgment. *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002); *see also* Fed. R. Civ. P. 56(c). However, in determining admissibility for summary judgment purposes, it is the contents of the evidence rather than its form that must be considered. *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003). If the contents of the evidence could be presented in an admissible form at trial, those contents may be considered on summary judgment. *Id*.

As to the parties filing motions to strike as a means of objecting to the evidence submitted in support of or against a pending motion for summary judgment, the Advisory Committee Notes to the most recent amendments to Rule 56 provide that a Rule 56(c)(2) objection "functions much as an objection at trial, adjusted for the pretrial setting. The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated. There is no need to make a separate motion to strike." Fed. R. Civ. P. 56 advisory committee's note (2010 Amendments). Motions to strike are limited to pleadings, which are defined by Federal Rule 7(a); affidavits and exhibits filed in support of,

or in opposition to, a motion for summary judgment are not pleadings. *See*

*Albertson v. Fremont County, Idaho*, 834 F. Supp. 2d 1117, 1123 n.3 (D. Idaho

2011). Thus, the motion to strike filed in this case will be construed as objections

to the materials filed by the opposing party.

## 2. Summary Judgment

Summary judgment is appropriate where a party can show that, as to any

claim or defense, "there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of

the principal purposes of the summary judgment "is to isolate and dispose of

factually unsupported claims ...." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24

(1986). It is "not a disfavored procedural shortcut," but is instead the "principal

tool[ ] by which factually insufficient claims or defenses [can] be isolated and

prevented from going to trial with the attendant unwarranted consumption of

public and private resources." *Id.* at 327. "[T]he mere existence of some alleged

factual dispute between the parties will not defeat an otherwise properly supported

motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

247-48 (1986). There must be a genuine dispute as to any material fact – a fact

"that may affect the outcome of the case." *Id.* at 248.

The evidence must be viewed in the light most favorable to the non-moving

party, and the Court must not make credibility findings. *Id.* at 255. Direct

testimony of the non-movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The Court must be "guided by the substantive evidentiary standards that apply to the case." *Liberty Lobby*, 477 U.S. at 255. If a claim requires clear and convincing evidence, the question on summary judgment is whether a reasonable jury could conclude that clear and convincing evidence supports the claim. *Id.*

When cross-motions for summary judgment are filed, the Court must independently search the record for factual disputes. *Fair Housing Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). The filing of cross-motions for summary judgment – where both parties essentially assert that there are no material factual disputes – does not vitiate the court's responsibility to determine whether disputes as to material fact are present. *Id.*

The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in her favor. *Deveraux*, 263 F.3d at 1076. The non-moving party must go beyond the pleadings and show "by her [ ] affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine dispute of material fact exists. *Celotex*, 477 U.S. at 324.

However, the Court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (quotation omitted). Instead, the "party opposing summary judgment must direct [the Court's] attention to specific triable facts." *Southern California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).

## MOTION TO STRIKE AND OBJECTIONS TO EXHIBITS

### 1. Eastop's Motion to Strike

Eastop moves to strike the Declaration of Jetta Hatch Mathews in Support of Motion for Summary Judgment (Dkt. 17-2) and the corresponding exhibits attached thereto. *Pl.'s Mot. Strike* at 2, Dkt. 22. Estop argues that the declaration does not comply with Federal Rule of Civil Procedure 56(c)(4) because it is not based on personal knowledge and the exhibits are not properly authenticated. *Id.* at 2-3. Eastop also argues that many of the exhibits present inadmissible hearsay evidence. *Id.* at 3-4. Finally, Eastop argues that the Defendants violated the Court's

protective order (Dkt. 13) for disclosing pages 45-46 of Maza's Deposition and Exhibit 18 which is a letter from Eastop's counselor regarding potential accommodations. *Id.* at 4-5; *Pl.'s Reply* 6-8, Dkt. 32.

### a. Authentication

The declaration of Jetta Hatch Mathews in support of the Defendants' motion for summary judgment (Dkt. 17-2) included twenty-seven exhibits including depositions, letters to Eastop from the school district, and emails or notes relaying concerns about Eastop's behavior. Eastop argues that Mathews did not have personal knowledge of these exhibits and thus they were not properly authenticated. *Pl.'s Mot. Strike* at 3, Dkt. 22. Defendants submitted supplemental declarations with their response to Eastop's motion. Dkt. 29-1 (Declaration of Jetta Hatch Mathews), 29-3 (Declaration of GwenCarol Holmes), 29-4 (Declaration of Brad Henson), 29-5 (Declaration of Shannon Maza).

Exhibits 1 (Due Process Hearing Transcript), 2 (Board of Trustees Finding of Fact and Conclusions of Law), 14 (May Notice of Due Process Hearing), 18 (Letter from Vegwert), 19 (September Notice of Due Process Hearing), 20-24 (Complete Deposition Transcripts), 26 (Master Agreement between Blaine County School District and Blaine County Education Association), and 27 (May Notice of Administrative Leave) are properly authenticated under Federal Rule of Evidence 901(b)(4). The defects in authentication of the remaining exhibits have been cured

by the supplemental declarations filed with the Defendants' response. Fed. R. Evid. 901(b)(1).

### b. Hearsay

Eastop objects to the following exhibits as inadmissible hearsay: 3 (Henson forward to Maza of Ellison email), 4 (Henson forward to Maza - email to Eastop re Ellison complaint), 5 (Eastop email exchange with Holmes re DUI), 6 (Notes of Oct 26 meeting between Maza, Blackman, and Eastop), 7 (Henson forward to Maza of email to Eastop re parent concerns), 8 (anonymous concerns re Eastop's slurred speech), 9 (statements from teachers re concerns about April 28 assembly), 10 (Henson forward to Maza of Slotten email re child concerns), 11 (statement from Ellison re Eastop's behavior), 12 (Parent concern re Eastop behavior), 14 (May 31 notice of due process hearing), 15 (Jones forward to VanSlyke of anonymous teacher complaint), 16 (email exchange between Jones and Maza re interactive process for Eastop). *Mot. Strike* at 4, Dkt. 22. Defendants argue that these exhibits are not offered for the truth of the matter asserted. *Def.'s Resp.* at 5, Dkt. 29. Instead, Defendants argue that exhibits 4, 7, 13, and 14 provide Eastop with notice that his conduct was inappropriate and needed corrected. *Id.* at 6. Defendants argue that exhibits 3, 8, 9, 10, 11, 12, and 15 are offered to show effect on the recipient and demonstrate that placing Eastop on probation was reasonable. *Id.*

The Court has relied on Defendants' exhibits 3, 4, 9, 10, and 12 in forming

its opinion. The Court finds that these exhibits are not hearsay because they are

offered for the effect on the on the School District staff (Ex. 3, 9, 10, 12) or notice

to Eastop regarding his behavior (Ex. 4). *See United States v. Tamura*, 694 F.2d

591, 598 (9th Cir. 1982). The claims presented in the exhibits regarding Eastop's

behavior, whether or not true, ultimately go to whether Defendants were justified

in imposing suspicionless testing. Accordingly, Eastop's objections to these

exhibits are overruled. Eastop's remaining objections are overruled as moot.

### c.  Violation of the Protective Order

Eastop claims that defendants violated the Courts protective order by filing

Exhibit 18 (letter from Eastop's therapist re accommodations) and Maza's full

deposition, without moving to seal those documents. *See Pl.'s Reply* at 6-7, Dkt.

32. Eastop argues that Exhibit 18 is a medical record that was marked confidential

when produced to Defendants after entry of the protective order. Defendants

respond that Exhibit 18 is not a medical record and was produced before the

protective order was filed and is thus not protected. *Def.'s Resp.* at 8-9.

Page 46 of Maza's deposition refers to a District employee by name who

was terminated for testing positive for alcohol. That employee is not involved in

this litigation. The parties agreed during the deposition that that employee's

information would remain confidential. Accordingly, the Court will order that

Maza's Deposition Transcript (Dkt. 17-4, Dkt. 29-2) be sealed.

Exhibit 18 is a letter from Eastop's therapist discussing possible accommodations. It relates to potential mental health diagnosis. The Court has not relied on this exhibit in reaching its decision, so to the extent it is objected to, that objection is moot. However, the Court will order that Defendants' Exhibit 18 (Dkt. 17-3, Dkt. 29-1) be sealed. Eastop's request for attorneys' fees related to the Motion to Strike is will be denied.

## 2. Defendants' Objection to Exhibit M

Defendants object to Plaintiff's Exhibit M (Dkt. 15-19) as inadmissible hearsay. *Def.'s App'x*, Dkt. 28-4. Exhibit M is a written note of a conversation between Linda Jones and HR Director Shannon Maza. Eastop argues that Jones' notes are admissible under Fed. R. Evid. 801(d)(2)(D) because Maza's statements are statements of a party opponent used against that party. *Pl.'s Reply* at 8-9, Dkt. 31. Eastop argues that Maza was employed by the School District, of which the Board of Trustees is the governing body, and as such she was acting as their agent. Defendants argue that Maza was no longer in her official capacity after the meeting ended so the last half of the notes are inadmissible. *Def.'s App'x* at 2, Dkt. 28-4.

When considering objections to evidence, at the summary judgment stage, the Court need not decide whether the note itself is admissible, but whether the information contained in the note is admissible. *Fraser*, 342 F.3d at 1036-37. At

trial Maza could be called to testify about statements she made to Jones and VanSlyke. Thus, the information contained in the Jones' note could be properly introduced at trial through Maza's testimony. Accordingly, the objection is overruled.

## MOTIONS FOR SUMMARY JUDGMENT

Eastop filed a motion for partial summary judgment as to his state law claims, breach of contract claims, Fourth Amendment claims, due process claim, and rehabilitation act claims. *Pl.'s Mot.*, Dkt. 15, 15-1. Defendants filed a motion for summary judgment as to all of Eastop's claims. *Def.'s Mot.*, Dkt. 17, 19.

### 1. Constitutional Claims

Eastop alleges the Board of Trustees violated his constitutional rights by requiring him to submit to an unreasonable search and then, when he refused, terminating him. *Compl.* at 23-24. Eastop also alleges the Board violated his procedural due process rights, arguing that the Board members had unfairly prejudged or were biased against him. *Id.* at 22. Eastop seeks to vindicate these alleged violations through 42 U.S.C. § 1983.[2]

---

[2] Defendants argue they are entitled to qualified immunity for Eastop's constitutional claims. *Def.'s Mem.* at 10, Dkt. 19. The Board members and Superintendent Holmes were sued in their official capacities and thus are not entitled to qualified immunity. *Daniels Sharpsmart, Inc. v. Smith*, 889 F.3d 608, 616 (9th Cir. 2018).

### a. Fourth Amendment Claim

The Probation Terms required Eastop to submit to drug and alcohol testing at the discretion of Principal Henson or his designee. *Pl.'s Ex. F,* Dkt. 15-10 at 20. Eastop was asked to submit to drug and alcohol testing on August 23, 2017. *Maza Depo.* at 63, Dkt. 17-4. Eastop refused, and was ultimately terminated for this refusal because the Board found that it violated the terms of his probation. *Findings of Fact, Conclusions, and Decision*, *Pl.'s Ex. H*, Dkt. 15-13 at 19. Eastop argues that the search condition in the Probation Terms was unreasonable and thus his Fourth Amendment rights were violated when he was fired for refusing to submit to an unreasonable search. *Pl.'s Mem.* at 7, Dkt. 15-1.

"[T]he Fourth Amendment protects individuals from unreasonable searches conducted by the Government, even when the Government acts as an employer...." *National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 665 (1989). The Fourteenth Amendment extends the requirements of the Fourth Amendment to state officers, including public school officials. *Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 652 (1995).

It is not disputed that the urinalysis and breathalyzer tests that Eastop was asked to take are searches under the Fourth Amendment. *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 616-17 (1989). Defendants make a series of

arguments to justify the inclusion of the testing provision in the Probation Terms.[3]

Defendant's argue 1) that Eastop refused to test and thus has no legally actionable claim for violation of his Fourth Amendment Rights, 2) Eastop consented to testing by signing his employment contract, 3) Defendants had individualized suspicion to justify the testing provision, and 4) the search required under probation term was reasonable as a "special needs" search. *Def.'s Mem.* at 3-10, Dkt. 19.

With regard to the Defendants' first argument, the Court is not persuaded that no search occurred because Eastop refused the requested test on August 23. Simply put, if an employee refuses to submit to an unreasonable search, and is fired for that refusal, his Fourth Amendment rights are violated. *Jackson v. Gates*, 975 F.2d 649, 653 (9th Cir. 1992).

---

[3] Eastop was fired for refusing to comply with the testing provision of his Probation Terms. The August 23 request to test was conducted pursuant to the terms of the probation, thus the court will focus on the reasonableness of the testing provision of the Probation Terms. If the testing provision of the Probation Terms was reasonable then the August 23 test would have been reasonable. *See Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987) (The search … was "reasonable" within the meaning of the Fourth Amendment because it was conducted pursuant to a valid regulation governing probationers.); *see also Palmer v. Cacioppo*, 429 Fed. Appx. 491, 498 (6th Cir. 2011); *Casillas v. Clark County Sch. Dist.*, 2013 WL 2179279, at *7 (D. Nev. May 17, 2013).

(Continued)

Similarly, Eastop's signing of his employment contract, even if predicated on Probation Terms,[4] did not constitute a waiver of his Fourth Amendment rights. It is well established that a search is reasonable when the subject voluntarily consents to the search. *Birchfield v. North Dakota*, 136 S. Ct. 2160, 2185 (2016). And, consent may be obtained when a person signs a contract giving his consent to future searches. *United States v. Burrow*, 696 Fed. Appx. 214, 216 (9th Cir. 2017). However, it is also well established that the State may not condition employment on a public employee's consent to an unreasonable search. *O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 717 (1996); *Delia v. City of Rialto*, 621 F.3d 1069, 1078 n.5 (9th Cir. 2010), *rev'd on other grounds Filarsky v. Delia*, 566 U.S. 377 (2012).

Ultimately, if the search is reasonable, the Plaintiff does not need to consent to it. *See Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 651-52 (1995); *Yin v. State of Cal.*, 95 F.3d 864, 872 n.19 (9th Cir. 1996). However, if the search is unreasonable, consent cannot cure the constitutional defect. *Delia*, 621 F.3d at 1078.

---

[4] The Court notes that the standard employee contract Eastop signed does not reference the Probation Terms. *Pl's Ex. G*, Dkt. 15-12 at 34. Eastop refused to sign the Probation Terms due to his objection to the search condition. Even if Eastop somehow impliedly consented to the search by signing the employment contract he certainly withdrew that consent by refusing to test on August 23.

The Court is also unpersuaded by the Defendants' third argument that they had individualized suspicion that Eastop "may have been under the influence at during [sic] school or school related activities in the past – and that such conduct was a current concern." *Def. Mem.* at 7, Dkt. 19. It is true that the School District had a reasonable suspicion testing policy, under which Eastop could have been tested if the administration had a *reasonable individualized suspicion* that he was under the influence of drugs or alcohol at work. *See Reasonable Suspicion Tests, Pl.'s Ex. F*, Dkt. 15-12 at 31. However, Defendants never tested Eastop under this policy. *Maza Depo.* at 43-44, Dkt. 17-4. When Eastop was required to submit to drug and alcohol testing, the School District officials did not suspect that he was under the influence of drugs or alcohol at that time, but required the testing to establish a "baseline." *Maza Depo.* at 63-4, Dkt. 17-4. Under these facts, Defendants cannot rely upon the School District's reasonable suspicion testing policy as justifying its demand that Eastop submit to testing.

### i. Reasonableness

Finally, then, we can turn to the Defendants' argument that the suspicionless testing provision was reasonable because of the School District's "special needs." A warrantless search without probable cause may pass constitutional muster "when 'special needs' beyond the normal need for law enforcement make the warrant and probable-cause requirement impracticable." *Yin v. State of California*, 95 F.3d 864,

869 (9th Cir. 1996) (quoting *Vernonia School Dist. 47J v. Acton*, 115 S.Ct. 2386,

2390-91 (1995). In *Vernonia*, the Supreme Court held that reasonableness of a

search in the special needs context is judged by balancing the search's intrusion on

the individual's Fourth Amendment Interests against its promotion of legitimate

governmental interests. *Vernonia*, 515 U.S. at 653. Under *Vernonia*, the factors to

be considered are: (1) the nature of the privacy interest upon which the search

intrudes; (2) the character of the intrusion; (3) the immediacy of the government

concern and the efficacy of the search for meeting it. *Id.* at 654-64; *Gonzalez v.*

*Metropolitan Transp. Authority*, 174 F.3d 1016, 1021-22 (9th Cir. 1999). Both

parties acknowledge that the *Vernonia* factors are the appropriate factors for

determining reasonableness in this case. *See Pl.'s Resp.* at 4, Dkt. 26; *Def.'s Reply*

at 2, Dkt. 33. Accordingly, the Court will apply each of those factors in

determining whether the suspicionless, non-random testing requirement imposed as

a condition of Eastop's further employment with the School District passes

constitutional muster.

### 1. Eastop's Privacy Interest

To begin with, Eastop, like any employee, has a somewhat reduced

expectation of privacy in the workplace with regard to demands made by his

employer. *See Yin. v. California*, 95 F.3d 864, 872 (9th Cir. 1996) (quoting

*O'Connor v. Ortega,* 480 U.S. 709, 717 (1986)("The employee's expectation of privacy must be assessed in the context of the employment relation.")

But the employee's privacy interest is also dependent on context, and is affected by the nature of their employment. *Vernonia*, 515 U.S. at 654. "Fourth amendment rights … are different in public schools than elsewhere; the 'reasonableness' inquiry cannot disregard the schools' custodial and tutelary responsibility for children." *Id.* at 656. The pervasiveness of the regulation of the profession, including background checks, safety regulations, and accreditation standards, may also reduce an employ's privacy interests. *See Int'l Bhd. of Elec. Workers, Local 1245 v. Skinner*, 913 F.2d 1454, 1463 (9th Cir. 1990); *Int'l Bhd. of Teamsters, Chauffeurs, W. Conference of Teamsters v. Dep't of Transp.*, 932 F.2d 1292, 1302–03 (9th Cir. 1991); *cf. Knox Cty. Educ. Ass'n v. Knox Cty. Bd. of Educ.*, 158 F.3d 361, 379 (6th Cir. 1998).

An employee's experiences at work may also serve to lessen their expectation of privacy. For example, being aware that your employer is concerned about your ability to adequately perform your job, may affect the reasonableness of one's expectation of privacy. *See Yin. v. California*, 95 F.3d 864, 872 (9th Cir. 1996) (finding that an employ's health had become a matter of concern for her supervisors when it affected her ability to perform her job). That is clearly a factor here, since Eastop was aware that the School District had fielded numerous

complaints about his behavior and conduct. This, in turn, had led the School District to place him on probation, with a condition that he submit to drug and alcohol testing.

Advance notice of the employer's testing requirement is another factor that may be relevant to determining an employ's legitimate expectation of privacy. *Id.*; *Nat'l Fed'n of Fed. Employees v. Weinberger*, 818 F.2d 935, 943 (D.C. Cir. 1987). In this case, advance notice was given because it was included as a condition of Eastop's probation, which was submitted to him along with his employment contract. But, the significance of that notice is undermined by Eastop's rejection of the probation terms.

In summary, Eastop had a substantially reduced expectation of privacy. This follows from his status as an employee, his position as a school teacher, his knowledge of the extensive complaints about his prior conduct, the District's decision to place him on probationary status, and his advance notice of the testing requirement, substantially reduces his expectation of privacy. *See Yin,* 95 F.3d at 872.

## 2.  Character of the Intrusion

Here the School District intended to require both urinalysis and the breathalyzer testing. *See Maza Depo.* at 63, Dkt. 17-4. Both involve substantial intrusions into Eastop's privacy.

The procedures for collecting urine samples "require employees to perform an excretory function traditionally shielded by great privacy." *Skinner*, 489 U.S. at 626. The degree of intrusion, however, depends on the manner in which the urine sample is produced (e.g., monitored or unmonitored, in a medical facility or public restroom). *Vernonia*, 515 U.S. at 658; *Skinner*, 489 U.S. at 626; *Int'l Bhd. of Teamsters*, 932 F.2d at 1302. While breath tests are generally less intrusive then urinalysis they also may present a serious intrusion on an individual's privacy. *Skinner*, 489 U.S. at 625-26; *Knox County*, 158 F.3d at 385-86. In both cases, courts consider: 1) Who is responsible for collecting the sample (e.g., a medical professional or law enforcement officer); 2) What information the tests disclose; 3) To whom the results are communicated; 4) Whether the results are kept confidential; and 5) Whether the tests may disclose otherwise legal off-duty drug use. *Skinner*, 489 U.S. at 626; *Vernonia*, 515 U.S. at 658-59; *Knox County*, 158 F.3d at 385. Surprise caused by a test, and the discretion of the supervisor in administering a test, also weigh on its potential intrusiveness. *Int'l Bhd. of Teamsters,* 932 F.2d at 1303; *Knox County*, 158 F.3d at 376.

The testing provision from the Probation Terms is set out below:

**D. Testing**

    1. At the discretion of Mr. Henson or designee, a request may be made to Mr. Eastop to submit to testing for alcohol or drugs. Mr. Eastop shall immediately comply with any such request to the fullest extent. Any such testing shall be solely at the expense of the District. Should such test results indicate that Mr. Eastop has any level of alcohol or any illegal/un-prescribed drug in his system while on school property and/or while serving his contractual duties for the District, such may result in an immediate recommendation for possible discharge.

*Program for Supervision and Evaluation, Pl.'s Ex. G*, Dkt. 15-12 at 40.

The testing provision is remarkable for what it does not include. It does not include any reference to the District's drug and alcohol policy which sets out testing procedures under the reasonable suspicion program. *See Policy 415.5, Pl.'s Ex. G,* Dkt. 15-12 at 29-31. It does not define which drugs will be tested for. It does not lay out any standards as to how the testing will be conducted, or by whom. And, it does not specify who will receive the results of the testing or how they will be handled. It also indicates Eastop may be terminated for having "any level" of drugs or alcohol in his system.

Maza stated in her deposition that the testing would be conducted by the School Resource Officer provided through a contract with the City of Hailey. *Maza Depo.* at 64, Dkt. 17-4; *Pl.'s Ex. P*, at 2, 4-5 Dkt. 26-2. But, this is not spelled out in the probation term, and there is no contract between the City and the School District which provides for drug or alcohol testing. *Pl.'s Ex. P.*, at 4-5, Dkt. 26-2.

The use of the school resource officer to administer the test makes the testing more intrusive than the use of an independent medical provider. *Cf.*

*Teamsters*, 932 F.2d at 1299. The lack of detail as to how the samples would be collected, where the samples would be analyzed, or who the results would be communicated to, adds to the intrusiveness of the testing.

### 3. Immediacy of the Government Concern and Efficacy of the Search for meeting it.

Finally, the Court considers "the nature and immediacy of the governmental concern at issue here, and the efficacy of [the search] for meeting it." *Vernonia*, 515 U.S. at 660. The governmental concern that must be shown has been described as a "compelling state interest." *Id.* at 661. In the Fourth Amendment context there is no fixed minimum quantum of governmental concern that will justify the search. *Id.* Instead, the governmental interest must be "important enough to justify the particular search at hand, in light of other factors that show the search to be relatively intrusive upon a genuine expectation of privacy. *Id.* The governmental need must be compelling, not symbolic. *Chandler v. Miller*, 520 U.S. 305, 322 (1997).

In analyzing the governmental concern courts consider whether the party to be tested exhibited a pronounced drug problem (*e.g., Skinner*, *Vernonia*), whether the employee occupies a unique position (*Von Raab, Gonzalez*), and the level of harm that may result from an intoxicated employee. *See Gonzalez*, 73 Fed. Appx.

at 989 (collecting cases); *Bluestein v. Skinner*, 908 F.2d 451, 455 (9th Cir. 1990); *Knox County*, 158 F.3d at 373-74.

Eastop occupied a "safety-sensitive" position. *Findings of Fact, Conclusions, and Decision* ¶¶ 16-19. Under Idaho Code § 33-512(4) the School Board is charged with protecting the health and morals of its students. *Id.* As a teacher Eastop was in a position *in loco parentis* to the students. *Bauer By & Through Bauer v. Minidoka Sch. Dist. No. 331*, 116 Idaho 586, 588 (1989).

Eastop argues that he was no more safety-sensitive than any other teacher, and thus, there is no justification for the greater invasion of privacy *Pl.'s Resp.* at 4, Dkt. 26; *Pl.'s Reply* at 10, Dkt. 31. Eastop challenges Defendants' assertion that the reports of erratic behavior and alcohol support the more invasive testing provision. *Pl.'s Resp.* at 5-7, Dkt. 26; *Pl.'s Reply* at 10, Dkt. 31. The District argues that the suspicionless testing provision was a necessary precaution to allowing a possibly intoxicated teacher back into the classroom and served a deterrent function to prevent future drug or alcohol use. *Def.'s Mem.* at 6-7, Dkt. 19.

Maza stated in her deposition that she personally never had reason to believe that Eastop was inebriated at work. *Maza Depo.* at 41, Dkt. 17-4. However, she also received reports from other teachers that they believed Eastop was intoxicated at work. *Id.* 41-43. Principal Henson stated in his deposition that he never had any

reason to believe that Eastop was engaged in the abuse of illegal substances. *Henson Depo.* at 56, Dkt. 17-3. Superintendent Holmes stated that at one point she thought Eastop was "under the influence" of something and exhibited "altered behavior." *Holmes Depo.* at 26, Dkt. 17-4.

Henson received reports that Eastop smelled like alcohol, and that there was speculation that he was drinking. *Henson Depo.* at 54-55, Dkt. 17-3. In the email Henson sent to Eastop on September 8 regarding concerns about his behavior, Henson specifically referenced Eastop's struggle with alcohol and told Eastop that he was not to leave the school between 7:15 a.m. and the end of the school day. *Henson Email, Pl.'s Ex. F,* Dkt. 15-10 at 11. Henson received phone calls from PTA members who were concerned that Eastop was "altered" when he interacted with them at an off-school-grounds fundraiser. *Pl.'s Ex. J.*, Dkt. 15-15. Henson also received multiple expressions of concern about Eastop's behavior at the April 28, 2017 school assembly, including the allegation that Eastop was slurring his words at times. *Henson Depo.* at 20-23, Dkt. 17-3; *Cassalia Letter, Def.'s Ex. 9*, Dkt. 29-4. Henson received an email from a teacher relaying a comment from her son that he thought Eastop was on drugs. *Slotten Email, Def.'s Ex. 10,* Dkt. 29-4.

Eastop stated in his deposition that he was never under the influence of alcohol at school. *Eastop Depo.* at 45, Dkt. 17-3. He also stated that he had never

had alcohol in his office. *Id.* He did admit that he had had contact with parents of a student after having a couple beers. *Id.* at 46, 120.

Bennion stated in his deposition that the Board directed Holmes to include testing in Eastop's probation and that the testing provision was important to the Board. *Bennion Depo.* at 29-33, Dkt. 17-4. Whatever notice the Board had of Eastop's alcohol use, they clearly thought it was necessary to implement testing as part of his continued employment. *Id.* at 34.

Here the nature of concern is clear – the School District had multiple reports that Eastop was intoxicated and acting erratically at school. As a teacher and elementary PE teacher, Eastop occupied a safety-sensitive position. What is not clear, and is disputed by the parties, is the immediacy of the need for a suspicionless testing provision in Eastop's probation terms. The District had a reasonable suspicion policy, under which it could have tested Eastop. His probation terms included a provision for unannounced and informal observations. *Program for Supervision and Evaluation, Pl.'s Ex. G*, Dkt. 15-12 at 36. The District could have closely monitored Eastop during his probation and tested him if it ever had reasonable suspicion that he was under the influence of drugs or alcohol at school. They chose not to do so.

#### 4.  Balancing

Considering the factors discussed above, the Court cannot say as a matter of law that the testing provision was either reasonable or unreasonable.

Eastop had a significantly reduced expectation of privacy. The testing provision is vague and standardless which weighs heavily against reasonableness. However, there is a dispute of material fact as to the immediacy of the School District's need to implement a suspicionless testing requirement when it had a reasonable suspicion testing policy.

In the special needs context, reasonableness requires a factual, context-specific inquiry. *O'Connor*, 480 U.S. at 726-28; *Chandler*, 520 U.S. at 314. Due to the dispute as to the immediacy of the School District's need for a suspicionless search policy, the Court concludes that there are disputed issues of fact which preclude granting summary judgment to either party. Simply put, a reasonable jury might find that the search was reasonable, but it might also find that the search was unreasonable. Accordingly, the Court will deny both parties motion for summary judgment.

#### b.  Procedural Due Process

Eastop alleges that his procedural due process rights were violated by the Board of Trustees when he was terminated. First, he alleges that the School District's legal counsel was both an advisor to the Board and prosecutor for the

administration in the discharge proceedings. *Compl.* at ¶ 101. Second, he alleges that the Board of Trustees or several of its members prejudged his case, or were actually or probably biased against him. *Id.* at ¶ 103.

To establish a due process violation, Eastop must first show that he had a protected property interest under the Due Process Clause, and must then establish that he was deprived of the property without receiving the process that she was constitutionally due. *Levine v. City of Alameda*, 525 F.3d 903, 905 (9th Cir. 2008). The parties do not dispute that Eastop had a protected property interest as a renewable contract teacher. The only issue, then, is whether he received the process he was due.

The Due Process Clause requires that an individual be given an opportunity for a meaningful hearing before he is deprived of any significant property interest. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985). At a minimum, due process also requires a hearing before an impartial tribunal. *Clements v. Airport Authority of Washoe Cnty.*, 69 F.3d 321, 333 (9th Cir. 1995). Policy makers with decision-making power, such as the Board in this case, enjoy a presumption of honesty and integrity. *Hortonville Joint School Dist. No. 1 v. Hortonville Educ. Ass'n*, 426 U.S. 482, 492 (1976). Mere prior involvement in or familiarity with the events involving a contested decision is insufficient to overcome this presumption "in the absence of a showing that [the decisionmaker]

is 'not capable of judging a particular controversy fairly on the basis of its own circumstances.'" *Id*. at 493 (quoting *United States v. Morgan*, 313 U.S. 409, 421 (1941)). To overcome an administrative board's presumption of honesty, a plaintiff must demonstrate that the tribunal was actually biased, or that there was an impermissible appearance of bias. *Withrow v. Larkin*, 421 U.S. 35, 47, 55 (1975).

Eastop alleges that Amy White and Scott Marotz, the School District's attorneys, "advised the Superintendent, provided advice to the Board, advised the HR Director, wrote the Probation Plan, reviewed the Recommendation for Discharge and presented the case against Eastop at the Due Process Hearing." *Pl.'s Mem.* at 8, Dkt. 15-1. Eastop also contends that Superintendent Holmes presented "embellished" and "inaccurate" information to the Board in the May 25 executive session. *Id.* at 9.

At the May 25th Board meeting, Holmes recommended that the Board place Eastop on probation. *Holmes Depo.* at 6-7, Dkt. 17-3. After going into executive session to discuss the matter, the Board voted to begin termination proceedings. *Id.* at 8. Maza stated in her deposition that the executive session regarding Eastop went on for about 40 minutes, which "could be" an unusual length of time to discuss an employee matter. *Maza Depo.* at 25-26, Dkt. 17-4. She also thought Holmes "overcommunicated" by bringing up allegations of what was investigated as opposed to just the violations, and went into detail regarding the sexual

harassment and Eastop's behavior. *Id.* at 26-27. Maza thought this unusual for an employee discipline matter. *Id.* at 27. Maza stated that Holmes embellished her allegations of sexual harassment. *Id.* at 29. Maza also stated that Holmes made allegations that Eastop had been drinking on school property and that he had been acting erratic. *Id.* at 29-30. Maza told Linda Jones that she was asked to join the executive session to provide more information about the investigation, and that Maza never attends Board meetings for "this kind of stuff." *Jones Notes, Pl.'s Ex. M,* Dkt. 15-19. Maza also told Jones that the Board was "primed with small town stuff." *Id.*

Eastop argues that the presumption of honesty and integrity to which the Board is entitled cannot be assumed when the Board relies on bad information. *Pl.'s Reply* at 8, Dkt. 31. Even if Holmes overshared at the May Board meeting, something changed over the summer and the Board changed its decision to terminate Eastop and instead placed him on probation. *Notice of Probation, Pl.'s Ex. F*, Dkt. 15-10. It is not clear from the record how this decision came about. However, the "mere exposure to evidence presented in nonadversary investigative procedures is insufficient in itself to impugn the fairness of the board members at a later adversary hearing." *Withrow*, 421 U.S. at 55. This is especially true here. The recommendation to proceed to a due process hearing prepared by Holmes relied upon Eastop's violation of the school's tobacco policy, his engaging in

inappropriate sexual conversations, and his erratic behavior. *Request to Schedule Due Process Hearing*, *Pl.'s Ex. E*, 15-9 at 7-10. However, Eastop was ultimately terminated for refusing to comply with the testing provision of his probation. *Findings of Fact, Conclusions, and Decision* ¶¶ 16-19, *Pl.'s Ex. H*, Dkt. 15-13 at 8.

Next, Eastop argues that he was denied due process because Amy White and Scott Marotz of Anderson, Julian & Hull, LLP, the District's law firm improperly advised the Superintendent, provided advice to the Board, wrote the Probation Plan, reviewed the recommendation for Discharge, and presented the case against Eastop at the Due Process Hearing. *Pl.'s Mem.* at 8, Dkt. 15-1.

To fairly analyze this claim, the Court will go into a fair amount of detail as to White and Marotz's involvement in Eastop's case. It is undisputed that Amy White and Maza prepared a recommendation for termination following the May 25 Board vote to schedule a Due Process Hearing, and that Superintendent Holmes discussed the recommendation with them, signed it, and sent it to Eastop. *Holmes Depo.* at 8, 13, 19, Dkt. 17-3. Holmes brought emails from Amy White to the August 15 executive session, said she had spoken with White, and described White's recommendation on how to move forward with probation. *Due Process Transcript, Def.'s Ex. 1* at 176-78, Dkt. 17-1. Holmes characterized the email as "a procedure to go about moving forward with probation instead of a termination." *Id.*

at 180. White and Maza wrote the Probation Terms following the August 15 Board

vote to place Eastop on probation. *Holmes Depo* at 23, Dkt. 17-4.

Holmes testifies that she could not recall whether any of the District's

lawyers were on the phone during the Board's August Executive Session, but that

Amy White might have been on. *Holmes Depo* at 42, Dkt. 17-4. Eastop's attorney

submitted a public records request to the Blaine County School District requesting

any communications relating to Eastop from Holmes, Maza, or the Board

members. *Stark Declaration*, Dkt. 15-3 at 2. He received 330 pages of documents

in response, including many emails among Maza, Holmes, White, and Marotz. *Id.*

However, there were apparently no such communications between White or

Marotz and any of the Board members. *See Id.*

At his deposition, Bennion was asked about placing Eastop on probation:

> Q: "…did you seek legal advice during this time? Not you personally;
> I mean you as the Board."
> A: "I believe the District sough legal advice."
> Q: "Do you know who that attorney would be?"
> A: "We generally use Amy White."
> Q: "is that your regular … go-to counsel?"
> A: "yes"

*Bennion Depo.* at 28-29, Dkt. 17-4. Bennion also testified about the August 15

Board meeting:

> Q: "[A]t this August board meeting, you discussed a recommendation
> from Ms. White; is that correct?"

> A: "I believe she counseled Dr. Holmes to go on probation instead of
> moving forward with termination."

*Id.* at 40.

At the October 25, 2017 Due Process Hearing, the School Board retained

Hearing Officer Marvin M. Smith, Eastop was represented by Paul Stark from the

Idaho Education Association, and the School District was represented by Scott

Marotz of Anderson, Julian & Hull LLP. *Hearing Transcript* at 1-2, Dkt. 17-2. Mr.

Smith drafted the findings of fact and conclusions of law, which Bennion signed.

*Bennion Depo.* at 44-45, Dkt. 17-4.

At the Beginning of the Due Process Hearing, Stark and Marotz conducted

*voir dire* of the Board of Trustees. *Hearing Transcript* at 10, Dkt. 17-2. During this

process, Trustee Bennion and Trustee Green testified that they remembered a

recommendation from White being shared at the August board meeting about

probation. *Id.* at 24. All the Trustees testified that they did not know Eastop outside

of the employment context and had not received any correspondence regarding

Eastop outside of the executive session. *Id.* at 5-27. The Trustees testified that they

had not had any conversations with an attorney regarding Eastop either in

executive session or outside of executive session. *Id.* at 24-25.

During questioning by Eastop's attorney none of the trustees specifically

remembered whether an attorney was present at any of the executive sessions.

However, Trustee Mandeville and Trustee Clayton testified that if an attorney was

present it would have been Adam King, who is the Board attorney. *See Id.* at 17, 23. Trustee Clayton further testified that "I actually never sought any legal guidance in any of this, because I'm, like, we are supposed to, as good trustees, keep our plates very clean of any conversations or anything that could lead us to predisposition of an opinion. So I have no contacts with any of those people other than the meetings that we've participated in." *Id.* at 23.

Idaho Code charges the Superintendent with conducting the investigation and advising the Board. Idaho Code § 33-513(5)(a), (i). What is clear from the record is that Maza and Holmes conducted an investigation, prepared recommendations and documents related to that investigation and employment decisions with the help of the District's attorney, Amy White. They then presented these documents and recommendations to the Board.

This is a far cry from cases Eastop relies on. In *Miller v. Ririe Joint School Dist. No 252*, the attorney advising the school district also directly advised the board and its individual members both prior to and after the initiation of discharge proceedings. 132 Idaho 385, 386 (1999). The School District attorney also represented the Board at court proceedings initiated by the Plaintiff. Further, the School District attorney represented the District in the discharge proceedings, *after representing the* Board in the bias proceedings. *Id.* at 387. In *Falash v. Inspire Academics, Inc.* the Plaintiff received a letter three months before his fairness

hearing stating that he had already been terminated and his position was posted two months before his hearing. 2016 WL 4745171 at *3 (D. Idaho Sept. 12, 2016).

Here, the Board changed its decision to terminate Eastop in May and instead put him on probation. A drug and alcohol testing provision was clearly important to the Board. Following Eastop's refusal to submit to the test, the Board voted to begin termination proceedings. There is no indication in the record that the Board somehow prejudged Eastop's termination. The Board was represented by an independent hearing officer, Eastop was represented by his own counsel and had the opportunity to put on evidence. Only two Board members were aware of White's involvement in the preparation of the probation recommendation and related documents, and those were presented through Maza and Holmes, not White herself. Marotz, not White represented the District at the Due Process Hearing. Eastop has not put on evidence sufficient to overcome the presumption of honesty and integrity the Board is entitled to. *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). Accordingly, as to Eastop's due process claim, the Court will grant the Defendants motion for summary judgment and deny Eastop's motion for summary judgment.

## 2. Rehabilitation Act

Eastop claims that Defendants violated the Rehabilitation Act, 29 U.S.C. § 794, by improperly forcing him to undergo a medical test and then firing him for

his refusal to test.[5] *Compl.* at 24-25. Eastop, without citing authority, argues that §

794 incorporates the Americans with Disabilities Act ("ADA") prohibition on

medical testing workers to determine if they are disabled. *Pl.'s Mem.* at 12, Dkt.

15-1. Defendants, also without citing authority, argue that under § 705, Eastop is

not an "individual with a disability" and not protected by the Rehabilitation Act,

because he posed a direct threat to others due to his alcohol abuse. *Def.'s Mem.* at

5-16, Dkt. 19 (citing 29 U.S.C. 705(20)(c)(v)).[6] Defendants also argue that the

Probation Terms were a valid last chance agreement.[7] *Id.*

Section 794 incorporates § 12112(d) of the ADA. *See Lee v. Arizona Bd. of

Regents*, 25 F. App'x 530, 534 (9th Cir. 2001); *Ellis v. San Francisco State

University*, 136 F.Supp.3d 1140, 1146-47 (N.D. Cal. 2015). The 9th Circuit has

---

[5] The only issue here is whether testing for alcohol violated the Rehabilitation Act. Testing for illegal drugs is excluded from the definition of "medical test." 42 U.S.C. § 12114(d)(1).

[6] 29 U.S.C. § 705(20)(c)(v): Employment; exclusion of alcoholics: For purposes of sections 793 and 794 of this title as such sections relate to employment, the term "individual with a disability" does not include any individual who is an alcoholic whose current use of alcohol prevents such individual from performing the duties of the job in question or whose employment, by reason of such current alcohol abuse, would constitute a direct threat to property or the safety of others.

[7] In all of the cases cited by Defendants, the party undergoing medical testing explicitly consented to the Last Chance Agreement. Eastop's employment contract did not reference the Probation Terms, Eastop did not sign the Probation Terms, and he refused to test on August 23. Even if the Probation Terms are construed as a last chance agreement, Eastop did not consent to it.

(Continued)

held that § 12112(d)(4)[8] applies to all employees, not just employees with a disability. *Indergard v. Georgia-Pac. Corp.*, 582 F.3d 1049, 1052–53 (9th Cir. 2009). Accordingly, Defendants' argument that Eastop was not an "individual with a disability" under § 705 fails, because even if he is not, § 12112(d)(4) applies to all employees.

Section 12112(d)(4) prohibits medical examinations that may reveal a disability unless that exam is "shown to be job related and consistent with business necessity." The School has the burden of proving that the alcohol testing satisfies the business necessity defense, which is quite high and is not to be confused with mere expediency. *Indergard*, 582 F.3d at 1057 n.3. In *Yin* the Ninth Circuit held that an employer can require an employee to undergo medical testing when "health problems have had a substantial and injurious impact on an employee's job performance." 95 F.3d at 868.

Eastop presents evidence that he was a good teacher who received good performance evaluations. *See Evaluation, Pl.'s Ex. C*, Dkt. 15-6 at 7-14. However, Henson received reports that Eastop was acting erratically and had screamed at

---

[8] 42 U.S.C. 12112(d)(4)(A) provides: A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.

students. *See Henson Depo.* at 20-22, Dkt. 17-3. Holmes stated that there had been "safety issues" with Eastop, she stated that Eastop was "acting very erratically, harassing staff, harassing kids, not on his game as far as being able to ensure that the students were safe, because he was not in control of himself." *Holmes Depo.* at 23, Dkt. 17-4.

The School District had a reasonable suspicion policy, under which it could have tested Eastop for alcohol. Instead it chose to implement the suspicionless testing policy as part of probation. The District needs to justify not just the testing policy in the Probation Terms, but the need for this testing over their reasonable suspicion testing policy. There were clearly concerns about Eastop's behavior at school, however there is a dispute of a material issue of fact as to whether the Defendants were justified in requiring Eastop to submit to alcohol testing and firing him for that refusal. Accordingly, the Court will deny both parties motions for summary judgment as to the Rehabilitation Act claims.

### 3. Idaho Law Claims

#### a. Grievance Procedure

Defendants argue that the grievance procedure included in the Master Agreement, which was negotiated between the District and Blaine County Education Association, provides the sole remedy for claims related to Eastop's rights under law, district policies, and contract claims. *Def.'s Resp.* at 6, Dkt. 28.

Defendants argue that Eastop failed to exhaust his contractual remedies. *Id*. Eastop responds that Defendants failed to timely raise this defense and that the grievance procedure is non-exclusive. *Pl.'s Reply* at 3-4, Dkt. 31.

The defense of "failure to exhaust nonjudicial remedies should be raised in a motion to dismiss, or be treated as such if raised in a motion for summary judgment." *Ritza v. Int'l Longshoremen's and Warehousemen's Union*, 837 F.2d 365, 368–69 (9th Cir. 1988), *overruled on other grounds in Albino v. Baca*, 747 F.3d 11162 (9th Cir. 2014). Here, Defendants have not raised the defense of failure to exhaust remedies in either a motion to dismiss or their motion for summary judgment. *See Def.'s Mem.*, Dkt. 19. Defendant's did not raise this defense until they *responded* to Eastop's motion for summary judgment. *Def.'s Resp.* at 6, Dkt. 28. Accordingly, the court finds that the defense of failure to exhaust is waived.

### b. Violations of Idaho Code

Eastop moves for summary judgment on his claims that the District violated Idaho Law by failing to provide him with a teaching contract by July 1, failing to allow him between 10 to 21 days to sign it, and failure to perform his evaluation with two documented observations by June 1. *Pl's Mem.* at 10-11. It is undisputed that the District did not meet the statutorily required deadlines to provide Eastop with his contact and evaluation. *See Def.'s Resp.* at 9, Dkt. 28. Defendants move for summary judgment on all three of Eastop's state law claims and argue that his

state law claims fail because Idaho Code creates no private right of action. *Def.'s Resp.* at 8-9, Dkt. 28.

Idaho Code §§ 33-515 and 33-513 do not expressly establish a cause of action. They do not provide any form of remedy or penalty for failure to comply. The Idaho Supreme Court has repeatedly quoted the Restatement (Second) of Torts § 874A as governing whether a court should imply a private cause of action for the violation of an otherwise silent statute. The Restatement provides:

> When a legislative provision protects a class of persons by proscribing or requiring certain conduct but does not provide a civil remedy for the violation, the court may, if it determines that the remedy is appropriate in furtherance of the purpose of the legislation *and needed to assure the effectiveness of the provision*, accord to an injured member of the class a right of action, using a suitable existing tort action or a new cause of action analogous to an existing tort action.

*White v. Unigard Mut. Ins. Co.*, 112 Idaho 94, 101 (1986) (emphasis original).

The Idaho Supreme Court has held that Idaho Code governing teachers and teacher contracts is "written into and made part of every written contract." *Robinson v. Joint School Dist. No. 150*, 100 Idaho 263, 265-66 (1979). Eastop's contract states that the contract is "subject to the applicable laws of the State of Idaho, the duly adopted rules of the State Board of Education and the policies of the district which are, by reference, incorporated herein and made part of this agreement." *Pl's Ex. G*, Dkt. 15-12 at 34. Eastop may vindicate his statutory rights through a breach of contract action. *Robinson*, 100 Idaho at 267; *Byers v. New*

*Plymouth Sch. Dist. No. 372*, 2013 WL 5943938, at *17 (D. Idaho Nov. 5, 2013).

This is exactly what he has done with claims four through six of his complaint.

Because the statutory provisions relied on in these claims are part of

Eastop's teaching contract, and may be redressed through a breach of contract

action, the Court finds that there is no private right of action conferred by I.C. §§

33-513 and 33-515. Accordingly, the Court will grant Defendants' motion and

deny Eastop's.

### c. Breach of Contract

Eastop raises three distinct breach of contract claims. First Eastop claims

that the District wrongly placed him on administrative leave, and ultimately

terminated him, in violation of Idaho Code 33-513(5). He argues that because the

testing provision of his probation was unreasonable, his refusal to test did not

violate "any lawful rules or regulations of the Board of Trustees or State Board of

Education, or conduct which could constitute grounds for revocation of a teaching

certificate." *Compl.* ¶¶ 42, 61. Because the Court cannot say as a matter of law that

the testing provision was either reasonable or unreasonable, as discussed above,

both parties' motions for summary judgment will be denied.

Second, Eastop claims that the District violated Idaho law and breached his

contract by failing to provide him with a new contract by July 1, and by failing to

allow him between 10 and 21 days to sign it. *Compl.* at ¶¶ 46-50, 62. Third, Eastop

claims that the district violated Idaho law and breached his contract (Claim Four) and the Master Agreement (Claim Five) by failing to provide him with an evaluation before June 1 and by failing to include two documented observations. *Compl.* at ¶¶ 53-57, 63, 68-71. Defendant's do not dispute that they failed to provide Eastop with a Contract by July 1 and that they failed to provide an evaluation with two documented observations by June 1. *Def.'s Resp.* at 9, Dkt. 28.

The elements for a claim for breach of contract are: (a) the existence of the contract, (b) the breach of the contract, (c) the breach caused damages, and (d) the amount of those damages. *Mosell Equities, LLC v. Berryhill & Co.*, 154 Idaho 269, 278 (2013). The Plaintiff bears the burden of proving that they have been damaged on account of the breach. *O'Shea v. High Mark Development, LLC*, 153 Idaho 119, 130 (2012).

Defendants argue that Eastop suffered no damage as a result of their breach as to his second and third contract claims. *Def.'s Mot.* at 21-22, Dkt. 19; *Def.'s Resp.* at 10-11, Dkt. 28. Eastop responds that the District's course of conduct leading to his termination has caused him damages. *Pl.'s Resp.* at 13-14, Dkt. 26; *Pl.'s Rep.* at 11, Dkt. 31. Eastop offers no evidence as to any damage arising from the District's failure to timely provide his contract or evaluation.

Eastop was ultimately provided a contract on August 22, which he signed that day. *Eastop Depo.* at 84, Dkt. 17-3; *Contract, Pl.'s Ex. G*, Dkt. 15-12 at 34.

There is no allegation by Eastop that he lost any wages due to the delay in receiving his contract. He was able to attend the professional development event for teachers on the first day of the 2017-18 school year. *Holmes Depo*. at 37-38, Dkt. 17-4. He received an evaluation which he was able to use at the fairness hearing. *Evaluation, Pl.'s Ex. C*, Dkt. 15-6 at 7-14. Ultimately the Board of Trustees found he was a good teacher. *Findings of Fact, Conclusions, and Decision*, *Pl.'s Ex. H*, Dkt. 15-13 at 15. Eastop was placed on administrative leave and ultimately terminated for refusing to test pursuant to the Probation Terms. Eastop would be in the exact same position he currently is if the District had timely provided his contract and teacher evaluation. The Court finds that Eastop suffered no damage from the District's failure to timely provide his contract and evaluation. Accordingly, as to Eastop's second and third contract claims, the Court will grant the Defendants' motion for summary judgment and deny Eastop's motion.

### d. Breach of Board Policy

Eastop claims that Defendants violated Board Policy and breached his contract by requiring him to submit to drug and alcohol testing without reasonable suspicion. *Compl.* at ¶¶ 74-79. Eastop argues that relevant board policies govern the terms of his probation. *See Pl's Mem.* at 11, Dkt. 15-1*; Pl.'s Reply* at 7, Dkt. 31. The Defendants argue that, because probation is necessarily a change in the

employment relationship, there is nothing that prohibits the terms of probation from varying from the Board's policies. *Def.'s Mem.* at 20.

The August 15, 2017 letter from Bennion to Eastop stated that the Board passed a resolution to place Eastop on probation pursuant to "any applicable provisions of the Idaho Code." *Notice of Probation*, *Pl.'s Ex. F,* Dkt. 15-10 at 15. Two sections of the Idaho Code govern placing a renewable contract teacher on probation, §§ 33-513 and 33-515. Under I.C. § 33-513 the Board of Trustees of each school district has the power to place professional personnel on probation for a material violation of any lawful rules or regulations of the board or the State Board of Education. § 33-513(5). Section 33-515 requires that, before a renewable contract teacher's contract is not renewed for unsatisfactory performance, that teacher be placed on a reasonable period of probation.

The Master Agreement entered into between the Blaine County School District and the Blaine County Education Association sets out the procedures to place an employee on probation under § 33-515 (unsatisfactory performance). *Master Agreement, Def.'s Ex. 28* at 8, Dkt. 28-2. The Master Agreement does not provide procedures for placing a teacher on probation pursuant to 33-513. For § 33-515 the Master Agreement provides that "the Board of Trustees shall … provide written notice to the employee providing the following: … c. The

provisions for adequate supervision and evaluation of the employee's performance during the probationary period." *Id.*

The parties have not identified, and the Court has not been able to find, any Idaho case law that clarifies the Board's authority under the probation provision of § 33-513(5).[9] What is clear is that the Board of Trustees has the power to place a teacher on probation for 1) unsatisfactory performance, or 2) a material violation of the any lawful rules or regulations of the board of trustees or state board of education. The Idaho Code gives no indication what terms of probation may be imposed or whether those terms need be negotiated. §§ 33-513, 33-515. The Master Agreement only requires notice of the terms of supervision and evaluation; it does not require an opportunity to agree to those terms. The parties have not cited any Board policies, regulations, or State law to the contrary.

---

[9] I.C. § 33-513(4) gives the board of trustees of each school district the authority to discharge certificated professional personnel for the following reasons:

> (F) or continued violation of any lawful rules or regulations of the board of trustees or of the state board of education, or for any conduct which could constitute grounds for revocation of a teaching certificate.

*See Ferguson v. Bd. of Trustees of Bonner Cty. Sch. Dist. No. 82*, 98 Idaho 359, 362, 564 P.2d 971, 974 (1977) ("[S]chool boards are given broad authority to define what constitutes grounds for discharge by promulgation of rules and regulations governing professional conduct of school teachers, this provision also establishes that discharge of a teacher must be based upon rules and regulations which are 'lawful,' or for conduct which could constitute 'grounds for revocation of a teaching certificate.'")

The Court finds that District may require a teacher who is placed on probation to comply with different or additional conditions than set out in the Board Policy. And, can terminate a teacher for violating those probation conditions if they are lawful. However, because the Court cannot say as a matter of law that the testing provision contained in the Probation Terms was reasonable, and therefore lawful, the Court will deny both parties' motions for summary judgment.

### e. Breach of Good Faith and Fair Dealing

Eastop claims that the Defendants violated the implied covenant of good faith and fair dealing in his employment contract. *Compl.* at 95. The Idaho Supreme Court has held that "[a]ny action by either party which violates, nullifies or significantly impairs any benefit of the employment contract is a violation of the implied-in-law covenant." *Sorensen v. Comm Tek, Inc.*, 118 Idaho 664, 669 (1990).

Because the Court will deny Defendants' motion for summary judgment as to Eastop's breach of contract claims relating to his wrongful termination and breach of board policy, the Court will also deny their motion as to this claim.

### f. Negligent Infliction of Emotional Distress

Eastop claims the District violated a legal duty owed to him when it demanded that he submit to drug and alcohol testing without reasonable suspicion and with knowledge that he suffered from alcoholism. *Compl.* at 82-85. Eastop claims that this breach caused him pain and suffering and emotional distress. *Id.* at

85. Defendants move for summary judgment on this claim, arguing that they did not breach a duty by enforcing the terms of the probation plan and that Eastop's emotional distress was not a foreseeable result of enforcing the probation plan.

In Idaho, a claim for negligent infliction of emotional distress requires a showing of the following elements: (1) a legally recognized duty, (2) a breach of that duty, (3) a causal connection between the defendant's conduct and the breach, and (4) actual loss or damage. *Frogley v. Meridian Joint Sch. Dist. No. 2*, 155 Idaho 558, 569 (2013). Negligent infliction of emotional distress also requires there to be some physical manifestation of the plaintiff's emotional injury. *Id.*

As the Defendants concede, if the Court finds that the testing provision was unreasonable, Eastop can show a legal duty was breached. *Def.'s Reply* at 10, Dkt. 33. Because the Court will deny the Defendants' motion for summary judgment as to the reasonableness of the testing provision it will also deny their motion as to the negligent infliction of emotional distress claim.[10]

---

[10] Defendants also claim that Eastop had no physical manifestation of the emotional distress, but do not elaborate on the point. In his deposition Eastop stated that "as the process went on, I was losing sleep…" *Eastop Depo* at 97, Dkt. 17-3 at 46. This seems to be enough of a physical manifestation for summary judgment. *Brown v. Matthews Mortuary, Inc.*, 118 Idaho 830, 837, 801 P.2d 37, 44 (1990). However, Eastop says his sleeplessness relates to the termination process overall without tying it to the testing requirement in the probation document.. *Eastop Depo.* at 96-97. Nevertheless, the Court deems Eastop's testimony sufficient to create an issue of fact which will need to be resolved by a jury.

### g.  Intentional Infliction of Emotional Distress

Eastop claims that the District intentionally inflicted emotional distress by recklessly and intentionally demanding that he submit to drug and alcohol testing without reasonable suspicion while knowing that he was under a disability of alcoholism. *Compl.* ¶¶ 88, 90. He further argues that having a uniformed law enforcement officer deliver school district notices to him and scheduling a uniformed law enforcement officer for the August 22 meeting caused him distress and harm. *Compl.* ¶¶ 89, 91. Defendants move for summary judgment on this claim arguing that their conduct was not sufficiently outrageous and that Eastop did not suffer "severe" emotional distress. *Def.'s Memo* at 25-26, Dkt. 19.

In Idaho, a claim for intentional infliction of emotional distress requires a plaintiff to show that (1) the defendant's conduct was intentional or reckless, (2) the conduct was extreme and outrageous, (3) there was a causal connection between the conduct and the emotional distress, and (4) the emotional distress was severe. *See Nation v. State Dep't of Correction*, 144 Idaho 177 (2007). "Unlike the tort of negligent infliction of emotional distress, intentional infliction of emotional distress does not require injury or a physical manifestation resulting from emotional turmoil." *Alderson v. Bonner*, 132 P.3d 1261, 1269 (Id. Ct. App. 2006) (citing *Curtis v. Firth*, 850 P.2d 749, 752 (Idaho 1992)).

Idaho courts require extremely bad behavior on the part of Defendants to allow a claim of intentional infliction of emotional distress. *See, e.g., Edmondson v. Shearer Lumber Prods.*, 139 Idaho 172 (2003) (noting that, even if a defendant's conduct is "unjustifiable," it does not necessarily rise to the "outrageous" standard; to do so, it must be "'atrocious' and 'beyond all possible bounds of decency'"). Finally, the distress must be so severe that "no reasonable man could be expected to endure it." *Davis v. Gage*, 682 P.2d 1282, 1288 (Id. Ct. App. 1984) (citations omitted).

Here, Eastop has not alleged sufficiently outrageous behavior on the part of the Defendants to survive summary judgment. Even assuming the drug and alcohol testing requirement is found to be unreasonable, it is a close question in a complex area of law, and not sufficient for an IIED claim. *See Ward v. Sorrento Lactalis, Inc*, 392 F. Supp. 2d 1187, 1195 (D. Idaho 2005) (holding that even if the defendant had violated the American's with Disabilities Act by firing the Plaintiff on his first day back from his third back surgery, the conduct was not sufficiently outrageous to support an IIED claim).

Eastop argues that delivery of the written notice of allegations and recommendation of discharge could have been accomplished by mail, and did not require personal service. He also contends that that having a uniformed officer deliver the notice to him was unnecessary and caused him anxiety. *Pl.'s Response*

at 14-15, Dkt. 26. School staff did schedule a school resource officer to attend at least part of the August 22 meeting where Maza and Henson discussed Eastop's probation with him. *Maza Depo.* at 54-55, Dkt. 17-4. However, Maza stated that the School Resource Officer had been scheduled to attend the August 22 meeting to explain the drug and alcohol testing procedure, but was never asked into the meeting because they could not agree about the testing provision in the probation document. *Id.*

Having a school resource officer accompany the superintendent to deliver a notice of termination proceedings may have been unjustified, but it is not outrageous. Likewise, scheduling a school resource officer to explain the drug and alcohol testing procedures included in the probation document is not outrageous, especially where that officer was never even asked to come into the meeting.

Even if the conduct was outrageous, it did not cause severe emotional distress. The Court recognizes, as Idaho courts have, that severity is generally an issue for the jury. However, Idaho courts have often made decisions as a matter of law that the emotional injury was not sufficiently severe. In *Jeremiah v. Yanke Machine Shop, Inc.*, 953 P.2d 992, 999 (1998), the Supreme Court of Idaho held that, "being seriously frustrated from enduring a hostile and abusive workplace" was insufficient. A child's screams, fear, and loss of sleep from seeing his mother being yelled at by another motorist after a car accident was insufficient. *Payne v.*

*Wallace*, 32 P.3d 695, 698–99 (Id. Ct. App. 2001). A plaintiff's testimony that they were "upset, embarrassed, angered, bothered and depressed" was insufficient. *Davis*, 682 P.2d at 1288.

Eastop argues that the termination process, including the drug and alcohol testing, and school resource officer involvement caused him to become very anxious and lose sleep. *Pl.'s Response* at 15, Dkt. 26; *Eastop Depo.* at 97, Dkt. 17-3 at 46. Having the officer accompany Blackman to deliver an employment notice made Eastop feel uncomfortable and raised his anxiety levels. *Eastop Depo.* at 97-99. Eastop stated that he did not specifically seek counseling for the officer visiting his house, but the process was something he talked to his therapist about. *Id.* at 99.

Thus, Eastop's distress is very similar to the plaintiff in *Duffin v. Idaho State University*, where this Court held that the plaintiff's distress did not reach the level of severity necessary to survive summary judgment. 2017 WL 6543873 at *8, (D. Idaho, December 21, 2017). There the plaintiff had seen a counselor to talk through "everything [he] went through," had lost some sleep, and was depressed. Simply put, the distress Eastop alleges he suffered was not severe enough to support a claim for the intentional infliction of emotional distress claim. Accordingly, the Court will grant Defendants' motion for summary judgment as to the intentional infliction of emotional distress claim.

# ORDER

**IT IS ORDERED that**:

1. Defendants' Motion for Summary Judgment (Dkt. 17) is **GRANTED IN PART and DENIED IN PART.**

2. Eastop's Motion for Summary Judgment (Dkt. 22) is **DENIED.**

3. Eastop's Motion to Strike (Dkt. 22) is **GRANTED IN PART and DENIED IN PART.** Maza's Deposition Transcript (Dkt. 17-4, Dkt. 29-2) and Defendants' Exhibit 18 (Dkt. 17-3, Dkt. 29-1) shall be SEALED.

4. Defendants' Motion to Substitute Declarations and Briefing *Nunc Pro Tunc* (Dkt. 24) is **DENIED as MOOT.**

5. Eastop's Motions to File Excess Pages (Dkt. 16, Dkt. 27) are **GRANTED.**

6. Defendants' Motion to File Excess Pages (Dkt. 18) is **GRANTED.**

7. The deadline for the parties to complete alternative dispute resolution shall be reset for 45 days after entry of this Order.

DATED: November 4, 2019

B. Lynn Winmill
U.S. District Court Judge